ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| ILEANA MONTAÑEZ DEL RÍO<br><br>Parte Recurrida<br><br><br>v.<br><br><br><br>BELLA GROUP<br><br>Parte Peticionaria | TA2025CE00568 | *Certiorari,* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2024CV10040<br><br>Sala: 805<br><br>Sobre:<br><br>Procedimiento Sumario Laboral |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de octubre de 2025.

Compareció ante este Tribunal la parte peticionaria, Bella Group (en adelante, "Bella" o "Peticionaria"), mediante recurso de *certiorari* presentado el 6 de octubre de 2025. Nos solicitó la revocación de la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, el "TPI"), el 22 de septiembre de 2025, notificada y archivada en autos el 24 del mismo mes y año. A través de dicho dictamen, el TPI declaró "No Ha Lugar" la "**Solicitud de Sentencia Sumaria**" presentada por la Peticionaria.

Por los fundamentos que expondremos a continuación, expedimos el auto de *certiorari* ante nuestra consideración, *revocamos* la *Resolución* recurrida y *desestimamos*, con perjuicio, la "**Querella**" presentada por la señora Montañez Del Río.

**I.**

El caso de epígrafe tuvo su inicio el 28 de octubre de 2024, con la presentación de una "**Querella**" por parte de la Sra. Ileana Montañez Del Río (en adelante, la "señora Montañez del Río" o Recurrida") en contra de

Bella, al amparo de la Ley Núm. 115-1991, *infra*. Dicha reclamación fue presentada a través del procedimiento sumario que provee la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, conocida como la "Ley de Procedimiento Sumario de Reclamaciones Laborales", 32 LPRA secs. 3118 *et seq*. Mediante la misma, la señora Montañez del Río expresó que fue contratada por Bella el 23 de septiembre de 2024 para ocupar el puesto de "team relations partner" con un salario de $50,000.00 anuales, pagadero bisemanal y con los siguientes beneficios, a saber: (1) plan médico, (2) plan dental, (3) servicio de gimnasio, (4) elegibilidad para participar en plan de retiro 401(k), (5) seguro por incapacidad a largo plazo, (6) seguro de vida, y (7) beneficio de vehículo corporativo. Alegó que fue despedida injustamente de dicho empleo el 26 de septiembre de 2024.

Explicó que trabajaba en Elevance Health cuando fue contactada por Brenda Marrero & Associates (en adelante, "BMA") para laborar con uno de sus clientes. Relató que se entrevistó con la Sra. Claudia Coira, quien le comunicó que la plaza disponible era en la compañía Bella. Afirmó que, al conocer dicha información, le comentó a la señora Coira que tenía activa una "**Querella**" ante el Departamento de Asuntos al Consumidor (en adelante, "DACo") en contra de Bella, con relación a cierto vehículo de motor perteneciente a ella. Sostuvo que la señora Coira consultó el asunto con la vicepresidenta de recursos humanos de Bella, la Sra. Daisy Rodríguez (en adelante, "señora Rodríguez"), y ésta le informó que dicha situación no presentaba un obstáculo para continuar con el proceso de reclutamiento.

Manifestó que, posterior a ello, fue seleccionada para ocupar el puesto de "team relations partner" en Bella y procedió a renunciar a su empleo en Elevance Health. Indicó que el 20 de septiembre de 2025 participó del proceso de contratación de Bella, registró sus primeras entradas de horas trabajadas y se le informó que dicho día marcaba oficialmente el inicio de sus labores. Destacó que comenzó a realizar sus funciones de empleo el 23 de septiembre de 2024. Señaló que ese día acudió al concesionario Honda en Ponce y al concesionario Ford en

Carolina, con el fin de participar en un proceso de investigación relacionado a sus funciones y recoger el auto corporativo que le fue asignado.

Alegó que, al día siguiente, la gerente de Bella, Sra. Suzette Rivera (en adelante, "señora Rivera"), le pidió que se encontraran en el almacén de la empresa ubicado en Cataño para culminar el proceso de investigación. Manifestó que, en dicha reunión, la señora Rivera le indicó que no conocía sobre la "**Querella**" instada en DACo y le realizó múltiples preguntas respecto a la misma. Relató que, luego de dicha conversación, se fue a almorzar y al regresar le notificaron la cancelación de sus funciones. Esbozó que el 26 de septiembre de 2024 fue citada a las instalaciones del concesionario Acura, ubicado en la Avenida Kennedy, donde le informaron su despido. Por último, argumentó que la "**Querella**" ante DACo es una actividad protegida bajo la Ley Núm. 115-1991, *infra*.

En vista de lo anterior, le solicitó al TPI lo siguiente: (1) $300,000.00 por daños y angustias mentales, (2) todos los salarios y beneficios dejados de devengar, (3) la reposición al empleo y en su defecto, la concesión del remedio de paga frontal, (4) honorarios de abogado y (5) cualquier otro remedio procedente en derecho.

El 18 de noviembre de 2024, Bella presentó su "**Contestación a la Querella**", a través de la cual negó la mayoría de las alegaciones expuestas en su contra y aclaró que la señora Montañez del Río no fue contratada por la empresa. Además, arguyó que la Recurrida no superó el periodo probatorio, por lo que no se convirtió en empleada. De forma alternativa, planteó que, de entenderse que existió un despido, el mismo fue por justa causa debido a la deshonestidad y/o falta de transparencia de la señora Montañez del Río. Añadió que la Recurrida participó en varias etapas del proceso de reclutamiento, incluyendo múltiples entrevistas con distintas personas, entre ellas, la señora Rivera, lo que demostró una actitud deshonesta de su parte y falta de transparencia.

Tras múltiples trámites procesales impertinentes a la controversia de autos, el 29 de julio de 2025, Bella presentó una "**Solicitud de Sentencia Sumaria**" mediante la cual argumentó que procedía la disposición de la

reclamación instada en su contra, toda vez que no existía controversia real alguna sobre los hechos materiales y pertinentes del caso. Específicamente, alegó que la Recurrida pretendía cobijarse bajo la Ley Núm. 115-1991, *infra*, por una alegada represalia, cuando los hechos demuestran claramente que la supuesta actividad protegida, esto es, la "**Querella**" comercial ante el DACo, ocurrió mucho antes de que existiera relación laboral alguna con Bella. Sostuvo que la terminación de su periodo probatorio respondió a una legítima pérdida de confianza generada por su falta de transparencia en el contexto de un puesto que exige absoluta honestidad, neutralidad y profesionalismo. Enfatizó que actuó como cualquier patrono razonable y diligente hubiese actuado frente a una situación similar. Explicó que la medida adoptada se enmarcó dentro de las facultades que le confiere la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, mejor conocida como "Ley Sobre Despidos Injustificados", puesto que los despidos de empleados durante su periodo probatorio no están sujetos a las disposiciones ni a las indemnizaciones establecidas en dicha ley. En vista de lo anterior, le solicitó al TPI que declarara "Ha Lugar" su moción y, en consecuencia, dictara sentencia desestimando la "**Querella**", con perjuicio.

Oportunamente, el 14 de agosto de 2025, la señora Montañez presentó su "**Oposición a Moción de Sentencia Sumaria y Contra Moción de Sentencia Sumaria**" (en adelante, "Oposición") en la que rechazó la postura de Bella y alegó que advino en conocimiento de quien era el cliente de BMA y su prospecto patrono, luego de haber sido entrevistada por la señora Coira. Afirmó que antes de la segunda entrevista con la señora Rodríguez y la señora Rivera, le divulgó a la señora Coira la situación de la "**Querella**" en el DACo y que esta última consultó dicha situación con Bella y le confirmó que el proceso de reclutamiento continuaría. Agregó que, durante los tres (3) días que trabajó para Bella no incurrió en conducta objetable alguna que justificara su despido. En armonía con lo anterior, le peticionó al Tribunal que declarara "Sin Lugar" la "**Solicitud de Sentencia Sumaria**" presentada por Bella.

El 4 de septiembre de 2025, Bella presentó su "**Réplica a Oposición a Moción de Sentencia Sumaria y Oposición a Contra Moción de Sentencia Sumaria**" (en adelante, "Réplica") mediante la cual reiteró los argumentos esbozados en su "**Solicitud de Sentencia Sumaria**" y destacó que la señora Montañez del Río, a pesar de haber sido entrevistada en múltiples ocasiones, en las que se le solicitó divulgar cualquier situación que la empresa debía conocer, omitió revelar la existencia de una "**Querella**" ante el DACo contra Bella. Arguyó que la omisión de dicha información evidenció un carácter incompatible con los valores de la empresa y peor aún, con la posición para la cual se le estaba contratando. Explicó que el cargo en cuestión exigía absoluta objetividad respecto a los empleados de la empresa que serían objeto de investigación, incluyendo a aquellos a quienes ella misma había denunciado ante el DACo por presuntas actuaciones indebidas. Manifestó que la decisión de no aprobar el periodo probatorio de la Recurrida respondió a la pérdida de confianza ocasionada por su falta de transparencia durante el proceso de reclutamiento realizado por el personal de Bella, y no a un acto de represalia. Añadió que las funciones de la señora Coira se limitaban al proceso de preselección de candidatos, por lo que no le correspondía evaluar ni tramitar posibles conflictos o litigios. En armonía con lo anterior, le solicitó al TPI que declarara "Ha Lugar" la "**Solicitud de Sentencia Sumaria**".

Finalmente, el 22 de septiembre de 2025, el foro de instancia emitió una *Resolución* en la que declaró "No Ha Lugar" la "**Solicitud de Sentencia Sumaria**", al concluir que existen controversias de hechos materiales del caso que impedían resolverlo por la vía sumaria. En detalle, determinó que existe controversia sobre los siguientes asuntos: (1) el contenido de la divulgación que hizo la señora Montañez del Río a la señora Coira durante el proceso de reclutamiento respecto a la "**Querella**" ante el DACo, (2) el conocimiento que tenía Bella de la "**Querella**" de Montañez del Río ante DACo previo a su reclutamiento, (3) el conocimiento que tenía Bella de la "**Querella**" previo a su despido, (4) determinar si hubo la intención o motivación o no de parte de Bella de tomar represalias contra Montañez por

la presentación de su "**Querella**" ante el DACo, (5) determinar si la presentación de la "**Querella**" fue la motivación de despido, (6) determinar si Montañez del Río ocultó intencionalmente su "**Querella**" ante el DACo o si por el contrario, divulgó oportunamente previo a su reclutamiento y (7) determinar si las razones para el despido articuladas por Bella son legítimas o, si por el contrario, son un pretexto para haber tomado represalias contra Montañez por su "**Querella**" ante el DACo.

Inconforme con lo anteriormente resuelto, Bella acudió ante nos mediante el recurso de epígrafe, en el que señaló la comisión de los siguientes errores:

> **PRIMER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE LA QUERELLA PRESENTADA POR MONTAÑEZ ANTE DACO CONSTITUYE ACTIVIDAD PROTEGIDA BAJO LA LEY 115, AUN CUANDO FUE UNA RECLAMACIÓN PREVIA AL VÍNCULO LABORAL.**
>
> **SEGUNDO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DENEGAR LA SENTENCIA SUMARIA PESE A QUE BELLA ARTICULÓ Y FUNDAMENTO UNA RAZÓN LEGÍTIMA Y NO DISCRIMINATORIA Y MONTAÑEZ NO PRESENTÓ EVIDENCIA SUSTANCIAL DE PRETEXTO.**
>
> **TERCER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL INCUMPLIR CON LA REGLA 36 Y NO ASENTAR DE FORMA COMPLETA LOS HECHOS ESENCIALES NO CONTROVERTIDOS.**

El 16 de octubre de 2025, la señora Montañez del Río presentó "**Oposición a Expedición de Auto de *Certiorari***".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

Sabido es que la Ley Núm. 2, *supra*, instituye un procedimiento sumario de adjudicación de pleitos laborales dirigidos a la rápida consideración y adjudicación de aquellas reclamaciones de empleados contra sus patronos relativos a salarios, beneficios y derechos laborales. De ahí que se le imponga una carga procesal más onerosa a la parte con

mayores medios económicos, el patrono. <u>Rivera v. Insular Wire Products Corp.</u>, 140 DPR 912, 924 (1996).

Así pues, el legislador implantó la política pública estatal de proteger el empleo y desalentar los despidos sin justa causa. A fin de lograr la consecución de dichos propósitos, el estatuto establece: (1) términos cortos para presentar la contestación de la querella o demanda; (2) criterios para conceder una sola prórroga para la contestación de la querella o demanda; (3) un mecanismo para diligenciar el emplazamiento del patrono; (4) el proceso para presentar defensas y objeciones; (5) límites a la utilización de los mecanismos de descubrimiento de prueba; (6) la aplicabilidad limitada de las Reglas de Procedimiento Civil en todo aquello que no esté en conflicto con el procedimiento sumario; (7) que ninguna de las partes pueda someter más de un interrogatorio o deposición, ni está autorizado a tomar una deposición a la otra parte después de haber sometido un interrogatorio ni viceversa, excepto cuando concurran circunstancias excepcionales; y (8) la obligación de los tribunales de emitir sentencia en rebeldía cuando el patrono incumple con el término para contestar la querella o demanda. 32 LPRA sec. 3120; *véase*, <u>Vizcarrondo v. MVM, Inc. *et al.*</u>, 174 DPR 921, 929 (2008).

**B.**

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". <u>Batista Valentín v. Sucn. Batista Valentín</u>, 216 DPR ___; 2025 TSPR 93. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria. A la luz de sus disposiciones, se dictará sentencia si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32

LPRA, Ap. V, R. 36.3; Negrón Castro y otros v. Soler Bernardini y otros, 216 DPR ____ (2025); 2025 TSPR 96.

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal. S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011).

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal cuente con la verdad de todos los hechos necesarios para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Oriental Bank v. Caballero García, *supra*, pág. 678. Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. S.L.G. Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168. Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 678.

Por su parte, la parte promovida por una moción de sentencia sumaria debe señalar y refutar los hechos materiales que entiende están en controversia y que son constitutivos de la causa de acción del demandante. Rosado Reyes v. Global Healthcare, 205 DPR 796, 808 (2020); Oriental Bank v. Perapi et al., 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. ELA v. Cole, 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones

ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Oriental Bank v. Caballero García, *supra*, pág. 8; Roldán Flores v. M. Cuebas *et al.*, 199 DPR 664, 677 (2018).

Adicionalmente, en León Torres v. Rivera Lebrón, 204 DPR 20, 47 (2020), el Tribunal Supremo resolvió que ninguna de las partes en un pleito puede enmendar sus alegaciones a través de la presentación de una solicitud de sentencia sumaria o su oposición. Así que, según lo expresa el propio tribunal, "la parte que se opone a una solicitud de sentencia sumaria no puede traer en su oposición, de manera colateral, defensas o reclamaciones nuevas ajenas a los hechos consignados en sus alegaciones, según consten en el expediente del tribunal al momento en que se sometió la moción dispositiva en cuestión". Íd., pág. 54.

Según las directrices pautadas por nuestro más alto foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. ELA, DTOP y otros, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. JADM v. Centro Comercial Plaza Carolina, 132 DPR 785, 802-803 (1983). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, 164 DPR 608, 626 (2005).

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020); Meléndez González *et al.* v. M. Cuebas, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. Vera v. Dr. Bravo, 161 DPR 308, 335 (2004)*.* De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Íd*.* En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. Íd. págs. 334-335.

En Meléndez González *et al.* v. M. Cuebas, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

Conviene desde ahora destacar que el Tribunal Supremo también ha expresado que es desaconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia. Ramos Pérez v. Univisión de P.R, 178 DPR 200, 2019 (2010); Carpets & Rugs v. Tropical Reps, 175 DPR 615, 638 (2009). No obstante, "cuando de los documentos a ser

considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales" nada impide que se utilice la sentencia sumaria en casos donde existen elementos subjetivos o de intención. Ramos Pérez v. Univisión de P.R., *supra*, pág. 219.

**C.**

La Ley Núm. 115-1991, según enmendada, conocida como la "Ley contra el Despido Injusto o Represalias a todo Empleado para Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial", 29 LPRA sec. 194 *et seq*., fue aprobada con el propósito de proteger a los empleados frente a posibles represalias que pueda tomar un patrono, motivadas por el ofrecimiento de testimonio, expresión o información ante un foro judicial, legislativo o administrativo. Cordero Jiménez v. UPR, 188 DPR 129, 136-137 (2013). En específico, el Artículo 2 (a) del referido estatuto dispone que:

> Ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley. 29 LPRA sec. 194b.

El empleado tendrá dos vías probatorias para establecer su caso: (1) demostrar la violación mediante evidencia directa o circunstancial y demostrar que hubo un nexo causal entre la conducta del demandado y el daño sufrido por el empleado o (2) establecer un caso *prima facie* de violación a la ley, probando que participó en un actividad protegida por el estatuto, que fue subsiguientemente despedido, amenazado o discriminado por el patrono y que existe un nexo causal entre la conducta protegida y la acción adversa . Rivera Menéndez v. Action Services, 185 DPR 431, 445 (2012). En vista de ello, el trabajador deberá presentar evidencia que establezca:

> (1) que fue tratado de forma distinta a otros empleados; (2) que existió un patrón de conducta antagónica en su contra; (3) que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias, o (4)

cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal. Íd.

En fin, el Tribunal Supremo reiteró en Feliciano Martes v. Sheraton Old San Juan, 182 DPR 368 (2011), que al querellante establecer su caso *prima facie*, la Ley Núm. 115-1991, *supra*, crea una presunción *iuris tantum* de violación al referido estatuto a su favor. Íd., pág. 394. Sobre el requisito de nexo causal, el Tribunal Supremo adoptó la tendencia establecida en la jurisdicción federal a los efectos de que se debe demostrar la existencia de suficiente proximidad temporal entre ambos eventos. Íd., págs. 397-398. No obstante, cuando se trate de una acción adversa que no pueda catalogarse como que ocurrió al poco tiempo de la alegada actividad protegida, el empleado tendrá que constatar elementos adicionales que comprueben la existencia de un nexo causal entre estos. Íd., pág. 400. Luego de establecido el caso, el patrono deberá alegar y fundamentar que tuvo una razón legítima y no discriminatoria para el despido. Íd. Ahora bien, el estatuto todavía le reconoce al empleado oportunidad de prevalecer si demuestra que la razón alegada por el patrono es un simple pretexto para el despido discriminatorio. Íd.

**III.**

En el presente caso, Bella nos solicitó la revocación de la *Resolución* del TPI en la que se declaró "No Ha Lugar" su "**Solicitud de Sentencia Sumaria**".

Los tres señalamientos de error esgrimidos están íntimamente relacionados, por lo que se tratarán de forma conjunta en la discusión. En síntesis, la Peticionaria sostiene que el TPI erró al: (1) concluir que la "**Querella**" presentada por la señora Montañez del Río ante DACo constituye una actividad protegida bajo la Ley Núm. 115-1991, *supra*, (2) al denegar la "**Solicitud d de Sentencia Sumaria**", a pesar de que Bella tenía una razón legítima y no discriminatoria para despedirla y al (3) no asentar de forma completa los hechos esenciales no controvertidos. Veamos.

Según adelantáramos, al momento de revisar una determinación del foro de instancia respecto a una solicitud de sentencia sumaria, estamos llamados a realizar una revisión de *novo* y limitarnos únicamente a adjudicar

las controversias con los documentos que obran en el expediente ante el foro *a quo*. Del análisis de la prueba que se presentó ante el TPI, determinamos que sobre los siguientes hechos esenciales y pertinentes no existe controversia:

1. La señora Montañez Del Río cuenta con una trayectoria profesional amplia en el campo de recursos humanos, habiendo ocupado distintos puestos en ese sector para diversas empresas.

2. El 2 de febrero de 2023, la Montañez Del Río presentó una "**Querella**" ante DACo contra Bella relacionada con una controversia comercial por un vehículo adquirido de Bella, y llevado al taller de Flagship Mazda en la Avenida Kennedy para servicio de mantenimiento.

3. En la "**Querella**" en DACo, la señora Montañez del Río alegó, entre otras cosas, "múltiples atropellos y faltas de respeto por parte del personal de Servicio de Mantenimiento del dealer Flagship Mazda".

4. Los hechos alegados en la "**Querella**" en DACo son exclusivamente de la señora Montañez del Río como cliente de Bella y no como empleada de Bella.

5. En junio de 2024, la señora Montañez Del Río solicitó para una vacante publicada por BMA través de la plataforma de *Indeed*.

6. BMA es una empresa de reclutamiento la cual se encarga de reclutar talentos que cualifiquen a lo requerido por el cliente.

7. El 1 de julio de 2024, la señora Coira, representante de BMA, se comunicó con la señora Montañez del Río y la entrevistó ese mismo día por videollamada.

8. El puesto de "Team Relations Partner" en Bella incluye, entre otras funciones, llevar a cabo investigaciones internas y manejar situaciones delicadas que involucran directamente a empleados de la empresa.

9. Entre otras de las responsabilidades principales del puesto de "Team Relations Partner" se encuentra: brindar asesoría en recursos humanos para lograr la resolución adecuada de situaciones relacionadas con relaciones laborales, desempeño y desarrollo de talento; implementar iniciativas y actividades que promuevan una cultura organizacional y experiencia de empleado positiva; participar en investigaciones de ambiente laboral o situaciones conflictivas cuando sea necesario; coordinarse con asesores legales internos y externos en el manejo de controversias o investigaciones laborales; establecer credibilidad y confianza con líderes y empleados, posicionándose como asesor y experto funcional en recursos humanos.

10. Para Bella las funciones del puesto de "Team Relations Partner" son unas sensitivas, que pueden afectar las operaciones de la empresa, y el empleo de las personas contratadas por la empresa.

11. Las funciones de referido cargo exigen del ocupante un alto grado de transparencia, honestidad y confidencialidad personal, dada la naturaleza sensible de los asuntos que maneja el Departamento de Recursos Humanos y la necesidad de sostener relaciones laborales fundadas en la confianza.

12. Las investigaciones que realiza el puesto de "Team Relations Partner" podían conllevar la imposición de medidas disciplinarias a empleados, incluyendo el despido.

13. Las investigaciones que realiza el puesto de "Team Relations Partner" incluye a cualquiera de los departamentos o divisiones de Bella, incluyendo el Área de Servicio.

14. Debido a la naturaleza y las responsabilidades del puesto de "Team Relations Partner", a la señora Montañez Del Río se le puso una limitación mediante la cual no podía realizar investigaciones con el concesionario de Honda de Bayamón, debido a que en el mismo laboraba su cuñado, el Sr. Jesse Weir.

15. La primera entrevista de la señora Montañez Del Río con personal de Bella fue con la señora Rivera, quien ocupa el puesto de Team Relations Manager, de manera presencial, en las oficinas de Bella en la Avenida Kennedy. Durante dicha entrevista también intervino la Sra. Elisa Pacheco.

16. Durante la primera entrevista con la señora Rivera, la Querellante no divulgó que tenía una querella activa ante DACO contra Bella, ni mencionó haber tenido un conflicto pendiente como clienta con la empresa.

17. El 10 de julio de 2024, la señora Montañez Del Río tuvo una entrevista virtual con la Vicepresidenta de Recursos Humanos de Bella, la Sra. Daisy Rodríguez.

18. Durante la entrevista con señora Rodríguez, la señora Montañez Del Río no divulgó que tenía una "**Querella**" activa ante DACo contra Bella, ni mencionó que tenía pendiente un conflicto como clienta de la empresa.

19. El 5 de agosto de 2024, la señora Montañez Del Río tuvo una segunda entrevista con la señora Rodríguez y la señora Rivera, en las oficinas de Bella en la Avenida Kennedy.

20. Durante dicha entrevista con la señora Rodríguez y la señora Rivera, la señora Montañez Del Río no divulgó que tenía una querella activa ante DACo contra Bella, ni mencionó tener un conflicto pendiente como clienta con la empresa.

21. Luego del proceso de entrevistas, Bella decidió contratar a la señora Montañez Del Río para el puesto de "Team Relations Partner" en el Departamento de Recursos Humanos.

22. El 20 de septiembre de 2024, la Querellante participó en un proceso de "onboarding" o incorporación al trabajo en Bella.

23. El 23 de septiembre de 2024, la señora Montañez Del Río y Suzette Rivera viajaron juntas a Ponce para atender una investigación.

24. El 23 de septiembre de 2024, se le hizo entrega a la señora Montañez Del Río de su "company car" en el concesionario de Ford de Carolina.

25. El 23 de septiembre de 2024, el asunto de la "**Querella**" en DACo no fue tema de conversación entre la señora Montañez Del Río y Suzette Rivera.

26. El 24 de septiembre de 2024, por la mañana, la señora Montañez Del Río le envió un mensaje de texto a su representante legal en la "**Querella**" en DACo, donde le indicó que, por motivos personales y familiares,  era su interés cerrar el caso y no continuar el mismo.

27. El 24 de septiembre de 2024, la señora Montañez Del Río se reporta a las oficinas de Bella en Cataño para una sesión de actualización informal o "catchup" con la señora Rivera.

28. El 24 de septiembre de 2024, la señora Montañez Del Río sostuvo una conversación con la Sra. Suzette Rivera, durante la cual se le preguntó qué pensaba hacer con su vehículo personal, ahora que se le había asignado un "company car".

29. Cuando la señora Rivera le hizo la pregunta mencionada en el párrafo anterior, la señora Montañez Del Río le divulgó por primera vez a Bella, a través de su conversación con la Sra. Suzette Rivera en Cataño, que tiene una "**Querella**" en DACo contra Bella.

30. El 24 de septiembre de 2024, la señora Montañez Del Río le indicó a la Sra. Suzette Rivera que la "**Querella**" en DACo había sido "archivada y cancelada".

31. La "**Querella**" en DACo estuvo activa hasta el 25 de septiembre de 2024, día que el representante legal de la señora Montañez Del Río radicó una Moción Solicitando Desistimiento con Perjuicio.

32. Inmediatamente de haber sido informada de la "**Querella**" en DACo, Suzette Rivera le informó a la Querellante que tenía que escalar la situación.

33. El 24 de septiembre de 2024, Suzette Rivera contactó a Claudia Coira para indagar sobre la Querella en DACo.

34. Luego de enterarse de la omisión por parte de la señora Montañez Del Río, Bella realizó un análisis sobre si la Recurrida era realmente la persona que podía cumplir con las expectativas de la empresa y de lo que Bella estaba buscando para el puesto de "Team Relations Partner".

35. El 26 de septiembre de 2024, luego del análisis de la situación, Bella tomó la decisión de no aprobar el periodo probatorio de la señora Montañez del Río.

36. La señora Montañez del Río no cumplió con las expectativas del puesto para el cual fue contratada, particularmente debido a la pérdida de confianza ocasionada por su falta de transparencia durante el proceso de reclutamiento al no divulgar la existencia de la "**Querella**" en DACo.

Establecido lo anterior, nos dirigimos a analizar los señalamientos de error esgrimidos. En resumidas cuentas, Bella sostiene que el foro *a quo* extendió indebidamente la protección que confiere la Ley Núm. 115-1991, *supra*, a la "**Querella**" presentada por la señora Montañez Del Río, en calidad de consumidora, mucho antes de que existiera relación laboral alguna con Bella. Argumenta, además, que poseía una razón legítima y no represiva para no aprobar el período probatorio de la Recurrida.

Conforme adelantáramos en los acápites anteriores, en nuestro ordenamiento jurídico procede dictar sentencia sumaria si conforme a la evidencia presentada, no existe controversia real y sustancial en cuanto a hechos esenciales y pertinentes del caso. 32 LPRA, Ap. V, R. 36.3. Un hecho material es aquel que tiene el potencial de impactar el resultado de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 679. Para ello, el Tribunal debe tener a su disposición todos los hechos necesarios para resolver la controversia. Íd., pág. 678. Esto es, un tribunal no puede disponer de un caso por la vía sumaria cuando existan hechos fundamentales controvertidos. SLG Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168.

Tras analizar detenida y comprensivamente los documentos que obran en el expediente, incluyendo la "**Querella**", la "**Solicitud de Sentencia Sumaria**, su correspondiente *Oposición,* la *Réplica y* los documentos anejados a dichas mociones, hemos arribado a la conclusión

de que el TPI erró al no disponer del caso por la vía sumaria. Nos explicamos.

De entrada, es menester resaltar que la señora Montañez del Río cuenta con una trayectoria profesional amplia y sólida en el ámbito de los recursos humanos, habiendo ocupado diversos puestos en dicho campo para distintas compañías. Esta experiencia necesariamente le confería suficiente conocimiento y entendimiento sobre los estándares éticos, los deberes de divulgación y las obligaciones de transparencia que rigen en los procesos de reclutamiento, así como de los actos que podrían constituir un conflicto de interés entre el futuro o actual patrono y el empleado o potencial empleado. Con dicho trasfondo, resulta innegable que comprendía, o al menos debía comprender, que el hecho de haber presentado dos (2) años antes una "**Querella**" ante el DACo contra la propia empresa que consideraba emplearla podía tener repercusiones éticas severas y poner en entredicho su sentido de responsabilidad, transparencia y lealtad, lo cual, conforme la prueba documental que obra en autos constituye un requisito fundamental para ocupar el cargo de "team relations partner".

No obstante lo anterior, la Recurrida omitió divulgar dicha información esencial durante prácticamente todo el proceso de selección, a pesar de haber participado en múltiples entrevistas con personal de Bella, incluyendo la señora Rivera, gerente del área, y la vicepresidenta de recursos humanos, la señora Rodríguez, en las que se le solicitó revelar cualquier situación pertinente que el patrono debiera conocer. La única persona con quien presuntamente compartió información fue con la señora Claudia Coira, reclutadora externa de BMA, de quien no surge de los autos documento o alegación alguna relacionada con ella poseía autoridad decisional dentro de la empresa ni era representante autorizado o agente de Bella. **Lo cierto es que la prueba demostró que <u>antes</u> de ser reclutada por la Peticionaria, la señora Montañez del Río tuvo <u>3 entrevistas</u> con personal de Bella directamente y <u>en ninguna</u> de dichas ocasiones la Recurrida informó sobre la existencia de la "Querella" ante el DACo**. De hecho, la señora Montañez del Río **<u>admitió</u>** que no informó de ello a su potencial patrono **<u>en</u>**

**ninguna de las etapas del proceso de reclutamiento con quienes fueron sus superiores en Bella**.

La referida omisión cobra particular relevancia al considerar la naturaleza del cargo para el cual fue contratada y la experiencia profesional previa de la Recurrida en el campo de los recursos humanos. Más aún, la señora Montañez del Río **admitió** que el puesto de "teams relations partner" requiere un alto grado de objetividad, transparencia, honestidad y confidencialidad, ya que sus deberes incluyen realizar investigaciones internas, brindar asesoría sobre controversias laborales, coordinar con asesores legales, recomendar medidas disciplinarias e incluso el despedir empleados. Igualmente, reconoció que las funciones mencionadas afectan directamente las operaciones de la compañía y exigen del empleado una conducta ética y responsable y que goce de la plena confianza del patrono.

La propia conducta de la señora Montañez Del Río demuestra que comprendía la importancia de divulgar situaciones que pudieran generar conflictos éticos. Como evidencia de ello, la prueba que obra en los autos electrónicos del TPI demuestran que la Recurrida sí informó que su cuñado trabajaba en un concesionario bajo la sombrilla de Bella; esto provocó que la Peticionaria le impusiera una limitación para evitar conflictos de interés en sus funciones investigativas.

Por tanto, ante el reconocimiento expreso por parte de la Recurrida sobre un potencial conflicto de interés con su cuñado, era lógico y hasta indispensable que hiciera lo propio e informar sobre la "**Querella**" activa que ella inició en contra de su futuro patrono y que versaba sobre un asunto que le afectaba directa y personalmente. Sostenemos, pues, que dicha omisión no puede atribuirse a un mero descuido, cuando sí pudo identificar e informar sobre otro conflicto de interés y ante el hecho innegable de su bagaje profesional en recursos humanos. Por el contrario, su actitud reflejó una falta de transparencia claramente incompatible con la naturaleza del puesto en cuestión, con los valores de la empresa y que se agrava al ser un hecho probado la trayectoria profesional de la Recurrida en el campo de los recursos humanos.

No fue hasta el 24 de septiembre de 2024, luego de haber iniciado labores y de ser cuestionada sobre qué haría con su vehículo personal, que la Recurrida reveló por **primera vez** la existencia de la "**Querella**" ante DACo a un empleado de Bella. Incluso, entonces, proveyó información incorrecta al afirmar que la misma había sido archivada cuando la realidad es que continuó activa hasta el 25 de septiembre de 2024, fecha en que su representación legal presentó una moción de desistimiento con perjuicio. De hecho, nos llama poderosamente la atención la realidad de que el mismo día en que la Recurrida informó al personal de Bella sobre la existencia del proceso administrativo ante el DACo fue precisamente el día en que ella le solicitó a su representante legal sobre su interés de desistir de la referida "**Querella**".

Entiéndase, la decisión de Bella de no aprobar el periodo probatorio de la señora Montañez del Río constituyó un ejercicio legítimo y razonable de su facultad patronal. Además de lo anterior, en el presente caso no puede sostenerse que hubo represalia, puesto que la alegada actividad protegida, ocurrió mucho antes de que existiera relación laboral alguna entre las partes. Por consiguiente, no se configura el nexo causal requerido para ampararse en la protección estatutaria contra represalias. La referida acción patronal respondió exclusivamente a consideraciones objetivas relacionadas con el buen y normal funcionamiento de la compañía, específicamente a la pérdida de confianza generada por la falta de transparencia de la señora Montañez Del Río al ocultar información esencial y pertinente durante el proceso de su reclutamiento. Tal deshonestidad, constituye, por sí misma, una causa legítima que justifica la decisión de Bella de dar por terminado su periodo probatorio y descarta cualquier alegación de represalia.

En suma, somos de la opinión de que la señora Montañez del Río con su experiencia y conocimiento en el ámbito de recursos humanos, conocía la importancia de informar la existencia de una "**Querella**" activa contra su potencial patrono. La decisión de no hacerlo quebrantó la confianza requerida para el adecuado desempeño del puesto y provocó la

finalización de la relación laboral durante el periodo probatorio. Huelga decir, además, que "los tribunales no podemos ser tan ingenuos como para creer cosas que nadie más creería". Pueblo v. Ríos Alonso, 156 DPR 428, 444 (2002); Pueblo v. Luciano Arroyo, 83 DPR 573, 582 (1961). La señora Montañez del Río tuvo múltiples oportunidades para informar del proceso administrativo ante el DACo directamente a representantes de Bella durante **3 entrevistas** que ocurrieron y escogió no mencionarlo. Su argumento principal estriba en plantear que como alegadamente se lo informó a la señora Coira era suficiente. No nos convence este planteamiento. El mero hecho de que se le hubiera informado dicha situación a la señora Coira no elimina la responsabilidad que tenía la Recurrida de informarle directamente a Bella. Tampoco se alegó, ni se desprende del expediente que BMA o la señora Coira fueran agentes del patrono, de manera que se pueda entenderse que la Peticionaria sabía de la "**Querella**" que la señora Montañez del Río había radicado ante el DACo.

Esto es, resolver lo contrario implicaría limitar la facultad de los patronos de tomar decisiones válidas en protección del buen y normal funcionamiento de la compañía durante el periodo probatorio y sobre un puesto de particular importancia dentro de la empresa. Por consiguiente, al no existir controversia real sobre hechos materiales y pertinentes que justifiquen la continuación del presente pleito, procede disponer del caso por la vía sumaria.

A lo anterior le añadimos el hecho de que la actividad protegida que invoca la Recurrida ocurrió en un momento en que no existía relación laboral con Bella y fuera del contexto del empleo. Súmese a ello, el hecho de que el proceso ante el DACo estaba relacionado a un asunto personal con Bella y nada tenía que ver, ni estaba relacionado con el trabajo. Entendemos, igualmente, que la reclamación ante dicho foro administrativo no está enmarcada en la protección que confiera la Ley Núm. 115-1991, *supra*.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *expedimos* el auto de *certiorari* ante

nuestra consideración, *revocamos* la *Resolución* recurrida y desestimamos, con perjuicio, la "**Querella**" presentada por la señora Montañez Del Río.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones